[No. S098266. Nov. 21, 2002.]

CADENCE DESIGN SYSTEMS, INC., Plaintiff and Appellant, v. AVANT! CORPORATION, Defendant and Appellant.

## COUNSEL

Keker & Van Nest, John W. Keker, Jeffrey R. Chanin, Michael H. Page and Ragesh K. Tangri for Plaintiff and Appellant.

James Pooley as Amicus Curiae on behalf of Plaintiff and Appellant.

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Bernard A. Burk and Jeffrey E. Faucette for Oracle Corporation, Xilinx, Inc., and 3Com Corporation as Amici Curiae on behalf of Plaintiff and Appellant.

O'Melveny & Myers, Daniel H. Bookin, Darin W. Snyder, James W. Shannon, Erika R. Frick and Hiro N. Aragaki for Defendant and Appellant.

Horvitz & Levy, H. Thomas Watson and Jason R. Litt for Truck Insurance Exchange as Amicus Curiae on behalf of Defendant and Appellant.

Robert G. Bone as Amicus Curiae on behalf of Defendant and Appellant.

## OPINION

**MORENO, J.**—We granted the request for certification of the United States Court of Appeals for the Ninth Circuit pursuant to California Rules of Court, rule 29.5, to address the following question:

 Under the California Uniform Trade Secrets Act (UTSA), Civil Code section 3426,[1] when does a claim for trade secret infringement arise: only once, when the initial misappropriation occurs, or with each subsequent misuse of the trade secret?

---

[1] All statutory references are to the Civil Code unless otherwise indicated.

██ ▪██ ██ We conclude that in a plaintiff's action against the same defendant, the continued improper use or disclosure of a trade secret after defendant's initial misappropriation is viewed under the UTSA as part of a single claim of "continuing misappropriation" accruing at the time of the initial misappropriation.[2]

## I. STATEMENT OF FACTS

The relevant facts, as stated in the Ninth Circuit's certification order to this court, are as follows:

Cadence Design Systems, Inc., and Avant! Corporation compete in the field of integrated circuit design automation. Both companies design "place and route" software, which enables computer chip designers to place and connect tiny components on a computer chip. Cadence formed in 1988 through the merger of several companies. Four senior employees left Cadence in 1991 to found Avant!, originally known as ArcSys.

In March 1994, Cadence vice-president Gerald Hsu resigned from Cadence to sign on with Avant!. Because Hsu possessed valuable business trade secrets and other confidential information, Cadence informed Hsu that it objected to his working at Avant!. Concerned that Hsu would reveal proprietary Cadence information when managing Avant!, Cadence sent Avant! a draft complaint naming Avant! and Hsu as defendants. Cadence alleged trade secret misappropriation and other causes of action. In negotiating a settlement of Cadence's claims, Cadence and Avant! apparently did not discuss Avant!'s alleged use of Cadence's Framework II (DFII) trade secret source code.[3]

After extensive negotiations, in June 1994, the parties entered into a confidential settlement agreement (the Agreement or Release) that included a mutual general release, which provided in part:

"Cadence, [Avant!] and Hsu . . . hereby forever release and discharge each other . . . of and from any and all manner of action, claim or cause of

---

[2]Shortly before the filing of this opinion, we were informed by the parties to this case that they have settled the underlying litigation, although they do not seek dismissal of proceedings in this court. When parties settle a case after oral argument, we may nonetheless exercise our discretion to issue an opinion "to resolve the legal issues raised, which are of continuing public interest and are likely to recur." (*People v. Eubanks* (1996) 14 Cal.4th 580, 584, fn. 2 [59 Cal.Rptr.2d 200, 927 P.2d 310].) The certified question asks us to decide a general point of law regarding an aspect of California's trade secret statute. Accordingly, although the matter is apparently rendered moot, we exercise our discretion to resolve the legal question.

[3]Computer software programs are written in specialized languages called source code. The source code, which humans can read, is then translated into language that computers can read. The computer readable form, which operates on a binary system, is called object code.

action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liabilities, demands, losses, damages, costs or expenses, including without limitation court costs and attorneys' fees, which they may have against each other at the time of the execution of this Agreement, known or unknown, including but not limited to any claims arising out of, or in connection with, or relating directly or indirectly to the following: Hsu's employment with Cadence, the cessation of Hsu's employment with Cadence, any wrongful termination of Hsu, any age or race discrimination by Cadence with respect to Hsu, any anticompetitive activity or unfair competition or trade secret misappropriation by Cadence, Hsu or [Avant!] with respect to Cadence, Hsu or [Avant!] with respect to Cadence, Hsu or [Avant!] . . . or any other actions taken by Cadence to with respect to Hsu or [Avant!] or by Hsu or [Avant!] with respect to Cadence."

The Agreement also contained in capital letters a waiver of section 1542 with the following language:

"THESE RELEASES EXTEND TO CLAIMS WHICH THE PARTIES DO NOT KNOW OR SUSPECT TO EXIST IN THEIR FAVOR, WHICH IF KNOWN BY THEM WOULD HAVE MATERIALLY AFFECTED THEIR DECISION TO ENTER INTO THIS RELEASE.

"In connection with such waiver and relinquishment, the Parties acknowledge that they are aware that, after executing this Agreement, they or their attorneys or agents may discover claims or facts in addition to or different from those which they now know or believe to exist . . . but that it is their intention hereby fully, finally and forever to settle and release all of the claims, matters, disputes and differences known or unknown, suspected or unsuspected, which now exist, may exist, or heretofore may have existed against each other in connection with the released matters. In furtherance of this intention, the release herein given shall be and remain in effect as a full and complete release notwithstanding the discovery or existence of any such additional or different claim or fact."

In the summer of 1995, a Cadence engineer discovered a "bug" (an error) in Avant!'s ArcCell software program that was similar to a bug he had inadvertently created several years earlier when writing source code for Cadence's DFII product. In December 1995, the Santa Clara County District Attorney executed a search of Avant!'s headquarters. Among the items seized was a log that showed line-by-line copying of Cadence source code in 1991 by a former Cadence employee and Avant! founder.

In December 1995, Cadence sued Avant! for theft of its copyrighted and trade secret source code and sought a preliminary order enjoining the sale of

Avant!'s ArcCell and Aquarius products. In anticipation of trial, both sides filed cross-motions for partial summary judgment concerning the effect of the Release. Avant! argued that because Cadence had released all its claims existing at the time of the Release, any claims based on continuing or future misuse of trade secrets that were stolen prior to the date of the Release were now barred. Cadence maintained that the only claims it had released were those for misappropriation occurring before the effective date of the Release, and not claims to redress Avant!'s continuing or new misuses of its trade secrets after the date of the Release.

The federal district court ruled on these summary judgment motions on October 13, 1999. Reversing its initial order, the district court held that all of Cadence's trade secret claims for post-Release misuse of its DFII trade secrets taken before the Release were barred by the Release. Cadence now is appealing this decision to the Ninth Circuit. If the Release barred Cadence's claims existing at the time of the Agreement, but did not bar future claims, the question still remains: What claims existed at the time of the Agreement? Are all of Cadence's claims for Avant!'s trade secret misappropriation part of the same claim, or does each successive misuse of Cadence trade secret source code give rise to a separate claim?[4]

## II. DISCUSSION

Avant! argues that a cause of action for misappropriation of a given trade secret by a particular plaintiff against a particular defendant arises only once, when the trade secret is initially misappropriated. In support of this position, it relies in large part on the rationale set forth in *Monolith Portland Midwest Co. v. Kaiser Aluminum & C. Corp.* (9th Cir. 1969) 407 F.2d 288 (*Monolith*), which applied the California common law of trade secrets. The *Monolith* court rejected the position exemplified by *Underwater Storage, Inc. v. United States Rubber Co.* (D.C. Cir. 1966) 371 F.2d 950, "that the wrong is the adverse use of the secret disclosed in confidence; each use is a new wrong, and a continuing use is a continuing wrong. Underlying this theory is the concept that a trade secret is in the nature of property, which is damaged or destroyed by the adverse use . . . . California does not treat trade secrets as if they were property. It is the *relationship* between the parties at the time the secret is disclosed that is protected. (*Futurecraft Corp. v. Clary Corp.* (1962)

---

[4]In the present case, it is unclear from the above facts whether the acquisition of the trade secret was itself improper and therefore a misappropriation, or whether the subsequent use of the secret was the initial misappropriation. In any case, the parties agree that Avant! had both acquired and used the trade secret prior to signing the Release. We will assume for purposes of addressing the certified question that the initial misappropriation occurred with the first use of the secret and will, for purposes of this case, equate "initial misappropriation" with "initial use."

205 Cal.App.2d 279, 23 Cal.Rptr. 198.) The protected relationship, contractual or confidential, is one to which, as Mr. Justice Holmes observed, 'some rudimentary requirements of good faith' are attached. 'Whether the plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied, but the confidence cannot be. Therefore the starting point for the present matter is not property . . . , but that the defendant stood in confidential relations with the plaintiffs . . . .' (*E. I. Du Pont de Nemours Powder Co. v. Masland* (1917) 244 U.S. 100, 102, 37 S.Ct. 575, 576, 61 L.Ed.2d 1016.) *The fabric of the relationship once rent is not torn anew with each added use or disclosure, although the damage suffered may thereby be aggravated. The cause of action arises but once . . . ."* (*Monolith, supra,* 407 F.2d at p. 293, italics added.)

On the other hand, Cadence asserts that the UTSA, which as discussed below was adopted by California in 1984, changed the common law view typified by *Monolith,* and now views trade secrets as property rather than simply as the protection of a confidential relationship. It further reasons that because trade secret misappropriation is the wrongful taking or use of protected property, *each* new use represents a new claim of misappropriation. As will be discussed, neither Cadence's nor Avant!'s position is entirely correct.

In order to answer the certified question, we must examine the pertinent language of the UTSA. As the Court of Appeal explained in *Glue-Fold, Inc. v. Slautterback Corp.* (2000) 82 Cal.App.4th 1018, 1023 [98 Cal.Rptr.2d 661] (*Glue-Fold*), the UTSA "was approved by the National Conference of Commissioners on Uniform State Laws in 1979 and adopted without significant change by California in 1984. (14 West's U. Laws Ann. (1990) U. Trade Secrets Act, p. 433; Stats. 1984, ch. 1724, § 1, pp. 6252-6253.)" (Fn. omitted.) Section 3426.1 defines certain key terms of the UTSA. "Trade secret" is defined as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (§ 3426.1, subd. (d).)

"Misappropriation" is defined as "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or [¶] (2) Disclosure or use of a trade secret of another without express or implied consent by a person who: [¶] (A) Used improper means to acquire knowledge of the trade secret; or

[¶] (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: [¶] (i) Derived from or through a person who had utilized improper means to acquire it; [¶] (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or [¶] (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or [¶] (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake." (§ 3426.1, subd. (b).)

"Improper means" is defined to "include[] theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means. Reverse engineering or independent derivation alone shall not be considered improper means." (§ 3426.1, subd. (a).)

■ Thus, the legal protection accorded trade secrets is fundamentally different from that given to patents, in which the patent owner acquires a limited term monopoly over the patented technology, and use of that technology by whatever means infringes the patent. The owner of the trade secret is protected only against the appropriation of the secret by improper means and the subsequent use or disclosure of the improperly acquired secret. There are various legitimate means, such as reverse engineering, by which a trade secret can be acquired and used. (See 2 Callman, The Law of Unfair Competition, Trademarks, and Monopolies (1981) § 14.01, p. 14-6; *id.*, § 14.15, p. 14-102.)

■ The most critical section of UTSA for purposes of this case is section 3426.6, which provides: "An action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. *For the purposes of this section, a continuing misappropriation constitutes a single claim.*" (Italics added.)

As the Court of Appeal recognized in *Glue-Fold, supra,* 82 Cal.App.4th at pages 1023-1024, "[s]ection 3426.6 is derived almost verbatim from section 6 of the Uniform Act as originally drafted. (See 14 West's U. Laws Ann., *supra,* U. Trade Secrets Act, com. to § 6, p. 462.) It is therefore appropriate to accord substantial weight to the commissioners' comment on the construction of what is now section 3426.6. [Citations.] [¶] That comment is: 'There presently is a conflict of authority as to whether trade secret misappropriation is a continuing wrong. *Compare Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.,* 407 F.2d 288 (CA9, 1969) (not a

continuing wrong under California law—limitation period upon all recovery begins upon initial misappropriation) with *Underwater Storage, Inc. v. U.S. Rubber Co.*, 371 F.2d 950 (CADC, 1966) . . . (continuing wrong under general principles—limitation period with respect to a specific act of misappropriation begins at the time that the act of misappropriation occurs). [¶] This Act rejects a continuing wrong approach to the statute of limitations but delays the commencement of the limitation period until an aggrieved person discovers or reasonably should have discovered the existence of misappropriation. If objectively reasonable notice of misappropriation exists, three years is sufficient time to vindicate one's legal rights.' (14 West's U. Laws Ann., *supra*, U. Trade Secrets Act, com. to § 6, p. 462.)" (Fns. omitted.)

The UTSA does not define the term "continuing misappropriation," but its meaning appears evident in light of the definition of "misappropriation." It is the continuing use or disclosure of a trade secret after that secret was acquired by improper means or as otherwise specified in section 3426.1, subdivision (b). Thus, for statute of limitations purposes, a continuing misappropriation is viewed as a single claim. The drafters of the UTSA explicitly affirmed *Monolith* and rejected the contrary view that misappropriation gives rise to multiple claims each time the trade secret is misused or improperly disclosed.

From our examination of the above statutes, a distinction between a "misappropriation" and a "claim" emerges. A *misappropriation* within the meaning of the UTSA occurs not only at the time of the initial acquisition of the trade secret by wrongful means, but also with each misuse or wrongful disclosure of the secret. But a *claim* for misappropriation of a trade secret arises for a given plaintiff against a given defendant only once, at the time of the initial misappropriation, subject to the discovery rule provided in section 3426.6. Each new misuse or wrongful disclosure is viewed as augmenting a single claim of continuing misappropriation rather than as giving rise to a separate claim.

Cadence makes much of the language in section 3426.6 that states, "[*f*]or *the purposes of this section*, a continuing misappropriation constitutes a single claim." (Italics added.) Based on that language, Cadence argues that a continuing misappropriation constitutes a single claim only for statute of limitations purposes. This argument cannot withstand scrutiny. The certified question asks when a *claim* for trade secret infringement arises. The term "claim" does not have some theoretical meaning apart from the context in which it is used. In the present case, the certified question is asked in the context of a release, which is intended to settle or prevent litigation. Therefore, "claim" must be defined in the context of litigation. If "continuing

misappropriation" is viewed as a single claim for statute of limitations purposes (see *Glue-Fold, supra,* 82 Cal.App.4th at pp. 1026-1028), then it is difficult to fathom how it could be treated as more than one claim for purposes of litigation generally. For example, a plaintiff could not legitimately plead separate claims of misappropriation for each misuse of a trade secret, for to do so would impermissibly evade the statute of limitations. Nor can it be asserted that separate "claims" accruing at different times can have the same limitations period, because that position is contrary to the rule that each civil action possesses its own statutorily prescribed limitations period. (See Code Civ. Proc., § 312.) The only other alternative is to hold that the term "claim" means one thing in the context of litigation and something else in the context of releases. There is no indication the Legislature intended this kind of inconsistency.

In fact, the phrase "for purposes of this section" can plausibly be explained as a means of contrasting section 3426.6 with section 3426.10, the only other section to refer to "continuing misappropriation." That section states: "This title does not apply to misappropriation occurring prior to January 1, 1985. If a *continuing misappropriation* otherwise covered by this title began before January 1, 1985, this title does not apply to the part of the misappropriation occurring before that date. This title does apply to the part of the misappropriation occurring on or after that date unless the appropriation was not a misappropriation under the law in effect before the operative date of this title." (§ 3426.10, italics added.) In other words, for purposes of section 3426.10, a continuing misappropriation is not necessarily a single claim. Rather, the claim must be divided in two if the continuing misappropriation took place partly before January 1, 1985—one common law claim for misappropriation occurring before that date, and one UTSA claim for misappropriation occurring thereafter. Indeed, if each misappropriation constituted a single claim, all that section 3426.10 would have had to have said is: This title does not apply to misappropriation occurring prior to January 1, 1985. There would be no need to refer to continuing misappropriation because, according to Cadence's theory, that concept does not exist outside the statute of limitations section and it would have been meaningless to refer to "the part of the misappropriation occurring on or after that date." (*Ibid.*)

Another occasion in which an act of continuing misappropriation may be said to constitute more than one claim is when multiple defendants are involved. For example, in *PMC, Inc. v. Kadisha* (2000) 78 Cal.App.4th 1368 [93 Cal.Rptr.2d 663], officers, directors, and investors of a corporation were sued personally for a trade secret misappropriation initiated before their involvement in the corporation. They sought summary judgment in part on the grounds that they could not be held liable because the initial misappropriation had occurred before they assumed their positions. The Court of

Appeal rejected that position, reasoning that the definition of misappropriation includes disclosure or use of a trade secret by persons who knew or had reason to know that the trade secret was acquired by improper means. (*Id.* at p. 1382, citing § 3426.1, subd. (b)(2)(B)(i)-(ii).) But Cadence's assertion that *Kadisha* advances its position is incorrect. That case holds only that there may be separate claims of continuing misappropriation among *different* defendants, with differing dates of accrual and types of tortious conduct—some defendants liable for initial misappropriation of the trade secret, others only for later continuing use. This holding does not conflict with our conclusion that there is only a single UTSA claim against a single defendant misappropriating a single plaintiff's trade secret.

Cadence cites Penal Code section 499c, providing criminal penalties for theft of trade secrets, in support of its argument. It quotes the noncodified statutory purpose of that statute as, in part, "to make clear that articles representing trade secrets, including the trade secrets represented thereby, constitute goods, chattels, materials and property and can be the subject of criminal acts." (Stats. 1967, ch. 132, § 1, p. 1163.) Avant!'s arguments notwithstanding, it appears indisputable that trade secrets are a form of property. But the nature of the property interest and the means by which the interest can be vindicated are matters of state law. The UTSA defines an act of continuing misappropriation for litigation purposes as a single claim.

Cadence cites *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.* (2d Cir. 1995) 68 F.3d 1478, 1485, in which the court, considering a release similar to the one at issue here, concluded the release did not shield defendants from liability for continuing wrongful use of trade secrets after the date of the release. The case was decided under either New York or New Jersey law. (68 F.3d at p. 1483, fn. 2 [acknowledging uncertainty as to which state law applied].) Neither of these states has adopted the UTSA. (14 West's U. Laws Ann. (2002 supp.) U. Trade Secrets Act, p. 128.) Moreover, the court did not analyze the relevant state statutes, and it is unclear whether its conclusion was based on statutory interpretation or interpretation of the intent of the parties to the release. It is therefore not persuasive authority for holding that each new trade secret misuse in California gives rise to a separate claim.

Cadence also cites federal case law holding that each act of patent infringement gives rise to a separate cause of action. (*Augustine Medical v. Progressive Dynamics* (Fed. Cir. 1999) 194 F.3d 1367, 1371.) Again, this case law has little relevance to the question presented. Although there are similarities between trade secret and patent law, there are also significant differences discussed above. Quite apart from these differences, our conclusion in the present case does not rest on reasoning from general principles of

intellectual property law, but rather on the construction of the specific statutory language of the UTSA. Nor is there any indication that the UTSA was patterned after patent law.[5]

Cadence also argues that viewing Avant!'s continuing misappropriation as a single claim effectively rewards Avant! with a license to use the misappropriated technology and to discourage parties from entering into releases in the future. But however the UTSA defines a trade secret claim, parties to a release in a trade secret dispute remain free to fashion the release as broadly or narrowly as they choose. Moreover, under our interpretation of the USTA, a trade secret infringer is by no means rewarded for its infringement with a license to use the infringed technology. Rather, a successful trade secret plaintiff is entitled to the full panoply of remedies, including injunctive relief against further misappropriation (§ 3426.2), damages for actual loss (§ 3426.3), and relief from unjust enrichment (*ibid.*).[6]

Our answer to the certified question is narrow. As stated, we do not accept Avant!'s position, at least stated in its strongest form, that only the initial misappropriation of a trade secret via the breach of a confidential relationship constitutes misappropriation—the UTSA plainly states otherwise. The potential damages encompassed by a continuing misappropriation claim may expand with each illicit use or disclosure of the trade secret. Nor do we address how the parties intended to define the term "claim" in the present release. All we decide is that the UTSA views a continuing misappropriation of a trade secret of one party by another as a single claim.

---

[5]Patent law has no equivalent to section 3426.6. The limitations on patent actions set forth in 35 United States Code section 286 differ considerably from section 3426.6. It provides in pertinent part: "Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action." (35 U.S.C. § 286.) "This provision has been said not to constitute a 'statute of limitations' in the usual sense of the term, in that 35 U.S.C. section 286 does not say that no suit shall be maintained. . . . The limitation contained in the 35 U.S.C. section 286 . . . does not bar infringement actions, but merely limits recovery of damages to infringements occurring during the six years preceding any damages action brought." (Rosenberg, 3 Patent Law Fundamentals (rev. 2d ed. 2001) § 17.06 [1][d], p. 17-100.) The federal statute does not employ "continuing misappropriation" or any equivalent concept.

[6]Cadence also cites in support of its position a letter from Assemblyman Elihu Harris, the sponsor of the UTSA, to Governor Deukmejian urging him to sign Assembly Bill No. 501 (1983-1984 Reg. Sess.), the UTSA, in order to bring "clarity and uniformity into this important area of law." (Assemblyman Harris, letter to Governor Deukmejian, Sept. 12, 1984, p. 2.) From this and other general statements in that letter, Cadence wishes to deduce a general policy of strengthening trade secret protection that would lead to support of its position. We are not persuaded. We do not discern how these general statements have any particular bearing on the certified question. Moreover, even if we assume that the UTSA was generally intended to strengthen trade secret protection (a point Avant! disputes), nothing we say in the present opinion vitiates such protection, as discussed immediately above.

## III. CONCLUSION

We conclude that a plaintiff's claim for misappropriation of a trade secret against a defendant arises only once, when the trade secret is initially misappropriated, and each subsequent use or disclosure of the secret augments the initial claim rather than arises as a separate claim.

Kennard, Acting C. J., Baxter, J., Chin, J., Brown, J., Nares, J.,* and Nott, J.,† concurred.

---

*Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.

†Associate Justice of the Court of Appeal, Second Appellate District, Division Two, assigned by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.