Filed 10/17/18

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF<br>SAN DIEGO COUNTY,<br><br>    Respondent;<br><br>FLORENCIO JOSE DOMINGUEZ,<br><br>    Real Party in Interest. | D073943<br><br><br><br>(Super. Ct. No. SCD230596) |

ORIGINAL PROCEEDING in mandate challenging an order of the Superior

Court of San Diego County, Charles G. Rogers, Judge.  Petition granted.


Summer Stephan, District Attorney, and Mark A. Amador, Linh Lam and

Christine L. Bannon, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Matthew J. Speredelozzi for Real Party in Interest.

G&P Schick, Malcolm D. Schick, and Douglas S. Rafner for the Institute of Environmental Science and Research Limited as Amicus Curiae on behalf of Petitioner.

Bardis Vakili, Vera Eidelman, Andrea Woods, Brett Max Kaufman, Brandon Buskey, and Rachel Goodman for the American Civil Liberties Union and the American Civil Liberties Union of San Diego & Imperial Counties as Amici Curiae on behalf of Real Party in Interest.

Wolf, Greenfield & Sacks, Gerald B. Hrycyszyn, Michael A. Albert, and Anant K. Saraswat; Dana M. Delger, Linda Starr, Justin Brooks, Alexander Simpson, and Paula M. Mitchell for the Innocence Project, Inc., the California Innocence Project, the Northern California Innocence Project at Santa Clara University School of Law, and Loyola Law School's Project for the Innocent as Amici Curiae on behalf of Real Party in Interest.

Justine M. Luongo, Richard Torres, Terri Rosenblatt, and Cynthia Conti-Cook for the Legal Aid Society of New York, New York as Amicus Curiae on behalf of Real Party in Interest.

In this writ proceeding, the People seek relief from a discovery order requiring them to produce certain materials related to DNA testing in a criminal action. With respect to the four categories of evidence at issue, three separate grounds for relief are pursued. We find each has merit. Accordingly, we grant the relief requested by the People in full.

FACTUAL AND PROCEDURAL BACKGROUND

Petitioner Florencio Jose Dominguez stands accused of conspiracy to commit murder.[1] (See Pen. Code, §§ 182, subd. (a), 187.)[2] For the purposes of this writ proceeding, one piece of evidence expected to be introduced at his upcoming trial is central: results from DNA testing conducted on a pair of blood-soaked gloves found near the scene of the crime.

No one disputes that DNA testing established the blood on the gloves' exterior to be that of victim. DNA on swabs from the gloves' interior, however, could not be tied to a single source. Rather, those swabs yielded a low template DNA mixture with multiple contributors. (See *People v. Lazarus* (2015) 238 Cal.App.4th 734, 784, fn. 51 [" 'Low template' DNA testing . . . refers to testing performed on 'amounts of DNA that are at or below the "stochastic threshold" ' "].) Given the number of contributors, the mixture was characterized as "complex." (See *Phillips v. State* (Md.Ct.App. 2015) 126 A.3d 739, 741, fn. 3 ["A 'complex' DNA sample refers to a DNA sample that includes genetic material from three or more individuals"].)

The San Diego Police Department Crime Lab (the lab) tested the swabs using the STRmix program, which it purchased in 2015 from the U.S. distributor (NicheVision) of

---

[1]     This petition is one small part of a long-running saga. Dominguez was initially tried in 2011; that jury hung. Upon his subsequent retrial, he was convicted of first degree murder (Pen. Code, § 187, subd. (a)) and conspiracy to commit murder (*id.* §§ 182, subd. (a)(1), 187). We upheld that conviction in *People v. Dominguez* (July 5, 2013, D060019) [nonpub. opn.]). In 2017, the superior court granted Dominguez's petition for writ of habeas corpus, reversing his conviction.

[2]     Further statutory references are to the Penal Code unless otherwise indicated.

3

a research institute owned by the government of New Zealand (the Institute of Environmental Science and Research Limited, aka ESR).  STRmix is a "probabilistic genotyping" program—i.e., one that " 'comprise[s] . . . software, or software and hardware, with analytical and statistical functions that entail complex formulae and algorithms.' "  (Chin et al., Forensic DNA Evidence: Science and the Law (The Rutter Group 2018) ¶ 11:7.)  It produces a likelihood ratio, which is generally "expressed as follows:  a match between the suspect and the evidence is (x number) of times more probable than a coincidental match."  (See *People v. Bullard-Daniel* (N.Y.Sup.Ct. 2016) 42 N.Y.S.3d 714, 717, fn. 4.)  Probabilistic genotyping has been described as " '[p]articularly useful for low-level DNA samples . . . and complex mixtures' " since it " 'can reduce subjectivity in the analysis of DNA typing results.' "  (Chin et al., Forensic DNA Evidence: Science and the Law, *supra*, ¶ 11:7.)

In February 2018, defense counsel informally requested discovery of materials related to the STRmix program from the People.  (See § 1054.1.)  Four categories of that request are pertinent to this writ proceeding:  (1) the STRmix user manual and any related updates; (2) the STRmix software program and any related updates; (3) the STRmix program's source code; and (4) ESR's internal validation studies and related documents.

In response to the informal discovery request, the prosecutor declared that the lab could not provide (1) the user manual because "it is copyrighted by ESR"; (2) the software because it would "not work without a license," which only ESR could furnish; (3) the source code because the lab "[d]oes not have knowledge or capacity" to do so; and (4) ESR's general internal validation records, presumably because the lab did not have

4

them.  The prosecutor further declared that ESR indicated it would produce all four pursuant to its "Defense Access Policy," which required execution of a nondisclosure agreement (NDA).

The NDA, in turn, imposed certain confidentiality restrictions on "protected information" related to and including the STRmix program.  Among those restrictions, the agreement required that the recipient of the information not "disclose or release Protected Information to any third party except with the specific prior written consent of ESR or except as expressly otherwise permitted in this Agreement."  A separate section entitled "Legal Proceedings," specified:

> "If Recipients or any of Recipients' Affiliates become legally compelled (by oral questions, interrogatories, requests for information or documents, subpoena, civil or criminal investigative demand, or similar process) to make any disclosure that is prohibited or otherwise constrained by this Agreement, Recipient or such Affiliate will provide ESR with prompt written notice of such legal proceeding(s) so that it may seek an appropriate protective order or other appropriate relief including, but not limited to, an order to have any testimony or records sealed, or waive compliance with the provisions of this Agreement.  In the absence of a protective order or Recipients receiving such a waiver from ESR, Recipients or Recipients' Affiliates are permitted (with ESR's cooperation but at Recipients' expense) to disclose that portion (and only that portion) of the Protected Information that Recipients or Recipients' Affiliates are legally compelled to disclose, provided however, that Recipients and Recipients' Affiliates must use reasonable efforts to obtain reliable assurance that confidential treatment will be accorded by any person to whom any Protected Information is so disclosed."

Apparently finding the possibility of obtaining the information under the NDA unsuitable, Dominguez moved to compel the People's production of the materials related to the STRmix program.  He asserted that ESR was part of the prosecution team and so

5

the onus was on the People to obtain documents from it.  He further argued that his right to a fair trial and effective cross-examination overrode any intellectual property concerns. Specifically as to the possibility of obtaining the material under the NDA, defense counsel deemed it untenable since in his view, that agreement might interfere with his use of the materials to defend his client.

In their responsive briefing, the People disputed the relevance of the requested items and ESR's purported status as part of the prosecution team.  The People also represented that ESR claimed trade secret privilege over the targeted materials.

Separately, Dominguez sought the materials in question directly from ESR by way of a subpoena duces tecum.  Pursuant to the Uniform Act to Secure the Attendance of Witnesses (§ 1334 et seq.), it was served on NicheVision (ESR's U.S. distributor) and ESR's U.S.-based counsel.

At most a day after the subpoena was served, the court heard Dominguez's motion to compel; no representative from ESR was present.  At the hearing, the DNA technical manager of the lab's forensic biology unit (Shawn Montpetit) testified.  He explained that the lab's STRmix purchase included access to periodic software upgrades and technical assistance, though the lab used the latter "pretty rare[ly]."  The lab also separately paid NicheVision to have 9 of its 15 analysts attend a weeklong training conducted by ESR in January 2015; since then, all the lab's analyst training related to the program was conducted in-house.

Montpetit additionally explained that the lab independently validated the STRmix program before using it on any casework.  He thought "that [the lab's] validation would

6

have keyed [it] in to any sort of major problem with . . . the underlying source code," if there was one. Documentation of the lab's validation studies was publicly available on the San Diego Police Department's website. The lab did not rely on ESR's internal validation studies, nor did it possess them. Similarly, Montpetit testified that the lab did not have access to the source code underlying the program. And while the lab had the user manual for the program, Montpetit testified that ESR's copyright over the material, as well as the lab's contract with the company, prevented its distribution.

Regarding the analysis conducted in this particular case, Montpetit testified that ESR had not been involved at all. While in rare cases the lab might contact ESR for further explanation when something appeared awry with results rendered, no such issue arose here.

Following Montpetit's testimony, the court heard extensive arguments from both defense counsel and the prosecution on the discovery motion. Defense counsel primarily argued that he had a right to look inside the proverbial "black box" that is STRmix. He reasserted that the NDA was a nonstarter as it could potentially prevent the defense from introducing at trial any helpful evidence it discovered. He accepted that ESR's cooperation was necessary for production of the software and source code. But he contended that was immaterial since, in his view, ESR was a member of the prosecution team. In support of the latter point, he cited the fact that ESR had "sold [the lab] a very expensive piece of software," and for that matter, "not just the software, but a training package and a technical support package."

7

Conversely, the prosecutor argued that ESR was not a member of the prosecution team, but rather just a company that had sold the police department "a tool." He also repeatedly pointed out that ESR had not been heard and he felt ill-positioned to argue their interests for them. He urged the court to refrain from making a decision before ESR had a say.

The court ultimately granted the motion to compel. It found ESR to be "part of the prosecution team to the extent that its program was used to generate this evidence," and so the People had to furnish the materials requested. The court also specifically found that having defense counsel sign the NDA was "not a valid solution" insofar as it unduly limited his ability to defend Dominguez. As for ESR's intellectual property rights, the court concluded that any concerns could be resolved with a protective order, to be crafted at a later date potentially with ESR's input. The judge also made "very clear that it . . . appear[ed] to [him] that it's the contract rather than the federal copyright and trademark and patent provisions that is the stumbling block for the police department in complying with this . . . discovery request."

Following the court's oral ruling, the next steps to be taken were discussed on the record. The prosecutor represented that they would most likely have to subpoena ESR to obtain the records. Accordingly, he requested that the parties reconvene for a status hearing in two weeks. The court acquiesced.

Defense counsel, the prosecution, counsel for the lab, and local counsel for ESR were present at the ensuing status hearing. The court put Dominguez's outstanding subpoena to ESR in abeyance, vacating the return date in light of the People's

8

representation that they would seek writ relief. It also reiterated its intent to impose an "appropriate" protective order, should its discovery ruling stand. The upcoming date for a *Kelly* hearing[3] was vacated, but the trial date remained in place.

Thereafter, the People sought writ relief in this court. Following a requested informal response from Dominguez, we issued an order to show cause as to why relief should not be granted and stayed all further proceedings in the case. We also granted several parties amicus curiae status. ESR filed a brief in support of the People, while the American Civil Liberties Union, the American Civil Liberties Union of San Diego and Imperial Counties, the Innocence Project, Inc., the California Innocence Project, the Northern California Innocence Project at Santa Clara University School of Law, Loyola Law School's Project for the Innocent, and the Legal Aid Society of New York City filed briefs in support of Dominguez.

## DISCUSSION

The question we are ultimately tasked with answering in this writ proceeding is whether the People can be compelled to produce the requested discovery regarding the STRmix program. On this record, we think not.

The reasons that lead us to issue writ relief in this case vary slightly with respect to the particular categories of evidence sought. The first important distinction is *who*

---

3    *People v. Kelly* (1976) 17 Cal.3d 24; see *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 831 [explaining that under the *Kelly* inquiry, " 'when faced with a novel method of [scientific] proof, [we] have required a preliminary showing of general acceptance of the new technique in the relevant scientific community' before the scientific evidence may be admitted at trial"].

possesses the information sought, since the People can only be compelled to produce materials held by members of the "prosecution team."  As will be explained, because we conclude ESR is not a member of the prosecution team, the People are not obliged to produce the materials solely in its possession.

With respect to the remaining pieces of evidence, we conclude the People are not obligated, at least at this juncture, to produce those either.  As to one of those categories, we conclude that no showing was made as to how the material constituted "exculpatory evidence" within the meaning of section 1054.1.  As to the other, a fatal procedural misstep occurred; specifically, ESR was not given the opportunity to be heard regarding its proprietary interests in the materials sought *before* discovery was ordered.  Accordingly, we grant the relief requested in full.

1.    *Who Has What?*

As already noted, the four categories of evidence at issue are:  (1) the STRmix user manual and any updates; (2) the STRmix software program and any updates; (3) the STRmix program's source code; and (4) ESR's internal validation studies and related documents.  As a threshold matter, we must address who *actually* possesses each of these.

Answering that question with respect to two of the categories is easy.  The People concede that the user manual and its related updates are in their possession.  Conversely, Montpetit's uncontroverted testimony established that the lab does not have ESR's internal validation studies.

10

The source code and software present a trickier issue. "Computer software programs are written in specialized languages called source code. The source code, which humans can read, is then translated into language that computers can read." (*Cadence Design Systems, Inc. v. Avant! Corp.* (2002) 29 Cal.4th 215, 218, fn. 3.) The People allege that they do not have access to the source code, but do have possession of the software.

Dominguez, on the other hand, contends the People possess both, although he does not specifically call out the People's ostensible possession of the software, instead focusing on the source code. This assertion, we note, deviates from the representations defense counsel made at the hearing on the motion: "I would submit that to get a copy of the software, we would need ESR's cooperation. And I don't -- and I think based on the testimony of Mr. Montpetit, and the declaration by [the prosecutor] that I accept the representation that they just don't have the ability to provide us a copy of the software. A copy of the source code, I accept that."

Yet more importantly, nothing in this record controverts Montpetit's testimony that the lab had no way to access the source code. Indeed, it was corroborated by the deputy district attorney, who declared in response to Dominguez's motion to compel, that the lab lacked the knowledge or capacity to provide the source code. Given the dearth of any evidence to the contrary, we conclude the source code is effectively in the possession of ESR alone.

We might be inclined to conclude similarly regarding the software, seeing as the lab has only a limited license to use the program on a particular number of computers.

11

Likewise, in the trial court, the deputy district attorney also represented that "[t]he software [would] not work without a license," which could only be provided by ESR. Nevertheless, we accept the People's concession that they possess the software. How, practically speaking, they would produce it remains an open question—though thankfully one outside the scope of what we must decide.

To summarize, two pieces of evidence—ESR's internal validation studies and the STRmix source code—are in the possession of ESR alone. The other two pieces of evidence—the STRmix software and the user manuals—are in the People's actual possession.

2.      *Production of Materials Possessed by ESR*

        a.      *Legal Framework*

Section 1054 et seq. dictates "an almost exclusive procedure for discovery in criminal cases" in this state. (*People v. Superior Court (Barrett)* (2000) 80 Cal.App.4th 1305, 1311 (*Barrett*); see § 1054, subd. (e); *In re Littlefield* (1993) 5 Cal.4th 122, 129 (*Littlefield*).) It provides "the only means for [a] defendant to compel discovery 'from prosecuting attorneys, law enforcement agencies which investigated or prepared the case against the defendant, or any other persons or agencies which the prosecuting attorney or investigating agency may have employed to assist them in performing their duties.' " (*In re Steele* (2004) 32 Cal.4th 682, 696 (*Steele*), quoting § 1054.5, subd. (a).) However, "[t]hese provisions do not regulate discovery from third parties," which must be sought by way of subpoena duces tecum. (*Barrett*, *supra*, 80 Cal.App.4th at p. 1315; accord, *Kling v. Superior Court* (2010) 50 Cal.4th 1068, 1077; see also §§ 1326, 1327.)

12

Within this statutory scheme, the prosecutor's disclosure obligations are found in section 1054.1. As pertinent here, that section requires the prosecuting attorney to share with defense counsel "[a]ny exculpatory evidence" and "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case, including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial." (§ 1054.1, subds. (e)–(f).)

Section 1054.1 is notably caveated: The information named must be disclosed only "if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies." (§ 1054.1.) Case law has interpreted this requirement to encompass not only information actually possessed but that " 'within the possession or control' of the prosecution" or put another way, " 'reasonably accessible' to it." (*Littlefield*, *supra*, 5 Cal.4th at p. 135; accord, *People v. Little* (1997) 59 Cal.App.4th 426, 431.) In other words, the statutory phrase "in the possession" is not read literally so as to very narrowly cabin the materials that can be sought. (§ 1054.1.) Rather, it serves primarily to "clarify and confirm that the prosecution has no *general duty* to seek out, obtain, and disclose all evidence that might be beneficial to the defense." (*Littlefield*, at p. 135.)

Independent of our criminal discovery statutory scheme, the federal constitution imposes a duty of disclosure on the prosecution. (*Barrett*, *supra*, 80 Cal.App.4th at p. 1314; see also § 1054, subd. (e).) Under *Brady v. Maryland* (1963) 373 U.S. 83

13

(*Brady*) and its progeny, a prosecutor must disclose material exculpatory evidence (so-called *Brady* material) to a criminal defendant whether requested or not. (*Id.* at p. 87; accord, *In re Brown* (1998) 17 Cal.4th 873, 879 (*Brown*).)

"The scope of [the *Brady*] disclosure obligation extends beyond the contents of the prosecutor's case file and encompasses the duty to ascertain as well as divulge 'any favorable evidence known to others acting on the government's behalf.' " (*Brown*, *supra*, 17 Cal.4th at p. 879, quoting *Kyles v. Whitley* (1995) 514 U.S. 419, 437.) This is so because those "acting on the government's behalf" are said to be part of the "prosecution team," and their knowledge is, in turn, imputed to the prosecutor. (*Brown*, at p. 879, internal quotation marks omitted.)

Although " '[t]here is no clear test to determine when an individual is a member of the prosecution team' " within the meaning of *Brady*, case law illumines a rough framework. (*IAR Systems Software, Inc. v. Superior Court* (2017) 12 Cal.App.5th 503, 516 (*IAR*).) " 'At its core, members of the team perform investigative duties and make strategic decisions about the prosecution of the case.' " (*Id.* at p. 516.) Yet the " 'team may also include individuals who are not strategic decision-makers,' " e.g., " 'testifying police officers and federal agents who submit to the direction of the prosecutor and aid in the [g]overnment's investigation.' " (*Ibid.*)

To be sure, " '[i]nteracting with the prosecution team, without more, does not make someone a team member.' " (*IAR*, *supra*, 12 Cal.App.5th at p. 517.) But greater involvement with the team makes imputation more likely. In that vein, relevant circumstances include " 'whether the individual actively investigates the case, acts under

the direction of the prosecutor, or aids the prosecution in crafting trial strategy.' " (*Ibid.*) Likewise, since the underlying justification is imputation, the question can also be phrased as one " 'of agency law: should a prosecutor be held responsible for someone else's actions?' " (*Id.* at p. 518.) This, in turn, requires consideration of—in simple terms—the "degree of control" the prosecution exercises over the ostensible agent. (*Ibid.*)

As noted above, the prosecution's disclosure obligations from our statutory scheme and from *Brady* are distinct. Yet case law interpreting *whose* information is subject to disclosure *by the prosecution* under these respective authorities can overlap. (E.g., *Barrett*, *supra*, 80 Cal.App.4th at p. 1311.) Indeed, our Supreme Court has more than once interpreted the statutory discovery requirements with respect to this particular issue as "consistent with" the prosecution's *Brady* obligations. (*Steele*, *supra*, 32 Cal.4th at p. 696; accord, *Barnett v. Superior Court* (2010) 50 Cal.4th 890, 904 (*Barnett*).) At the very least, "[t]here is no reason to assume the . . . statutory phrase ["in the possession of the prosecuting attorney or . . . investigating agencies" (§ 1054.1)] assigns the prosecutor a broader duty to discover and disclose evidence in the hands of other agencies than do *Brady* and its progeny." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1133–1134, disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

  b. *Analysis*

With those background principles in mind, we turn to the first question at hand: Can the prosecution be ordered to produce materials that are solely in ESR's possession? The outcome depends on whether ESR's provision of a software program, related

support, and relevant updates, as well as the prosecution's use of that software in this case, is enough to make it a member of the prosecution team within the meaning of our criminal discovery statutes and *Brady*. We conclude it is not.

Foremost, we observe that ESR provided no input or assistance specific to Dominguez's case—except insofar as the prosecution's use of its software program can be deemed tantamount to ESR investigating the case. Indeed, were it not for this discovery request, ESR would likely have no knowledge of the matter whatsoever. Accordingly, we cannot fairly say that *ESR* "investigated" the charges at hand. (See § 1054.1 ["in the possession of the prosecuting attorney or . . . know[n] . . . to be in the possession of the *investigating* agencies" (italics added)].)

In the context of criminal discovery, *Barrett*, *supra*, 80 Cal.App.4th 1305 underscores the significance of the investigatory nature of an entity's role. There the defendant was charged with murdering his cellmate, and sought pretrial discovery from the California Department of Corrections (CDC), which managed the prison where the crime took place. (*Id.* at p. 1309.) He requested discovery both of materials related to the CDC's investigation of the charges and of records it kept in the course of running that prison. (*Id.* at pp. 1309–1310.) The court explained that "CDC ha[d] a hybrid status: part investigatory agency, and part third party." (*Id.* at p. 1317.) The defendant could— and indeed had to—employ our criminal discovery scheme (§ 1054 et seq.) to obtain documents that CDC generated in its investigatory capacity. (*Barrett*, at p. 1317.) But he could not use that scheme to obtain "discovery of materials from CDC that [were] strictly related to its operation of [the prison], that is, materials CDC generated when it was not

16

acting as part of the prosecution team." (*Id.* at p. 1318.)  With respect to those documents, Barrett would have to use a subpoena duces tecum.  (*Ibid.*)

*People v. Uribe* (2008) 162 Cal.App.4th 1457 (*Uribe*) similarly emphasizes the importance of an agency's investigatory status.  In *Uribe*, the defendant sought a new trial based on the prosecution's nondisclosure of a videotape of the sexual assault victim's examination (the SART exam), which had been in the possession of the medical center that conducted the exam.  (*Id.* at p. 1463.)  Our colleagues in the Sixth Appellate District determined the video was suppressed within the meaning of *Brady*.  (*Id.* at p. 1481.)  In reaching that conclusion, *Uribe* "reject[ed] any suggestion that the SART exam . . . was not investigative" since (1) it was "clearly spearheaded by the police"; (2) "[a] major purpose of the examination was to determine whether the allegation could be corroborated with physical findings"; (3) the examiner "collected and preserved physical evidence, consistent with statutory protocol"; and (4) according to general practice, the examiner "provided a copy of the forensic report to the police."  (*Id.* at p. 1479.)

In Dominguez's view, *Uribe* is an analog for this matter.  He contends the STRmix program usurps the lab analyst's role in providing the final statistical comparison, and so the program—not the analyst—is effectively the source of the expert opinion rendered. In support of this argument, he relies heavily on a law review article regarding "machine testimony."  (Roth, *Machine Testimony* (2017) 126 Yale L.J. 1972.)

While a creative argument, we are unpersuaded by Dominguez's reliance on the concept of "machine testimony" as a basis for imputing all of ESR's knowledge to the prosecution in this case.  Foremost, we think he overstates the risk here that the lab is

17

"act[ing] as [a] 'mere scrivener[ ]' " for STRmix's analysis.  (Roth, *Machine Testimony*, *supra*, 126 Yale L.J. at p. 1979.)  As Monpetit explained, "[t]here are still decisions that an analyst has to make on the front end in terms of determining the number of contributors to a particular sample and determin[ing] which peaks are from DNA or from potentially artifacts," which would be excluded.  The program then performs a "robust breakdown of the DNA samples," based at least in part on "parameters [the lab] set during validation."  After STRmix renders "the diagnostics," the lab "evaluate[s] . . . the genotype combinations . . . . to see if that makes sense, given the data [it's] looking at."  After the lab "determine[s] that all of the diagnostics indicate that the STRmix run has finished appropriately," it can then "make comparisons to any person of interest or . . . database that [it's] looking at."  We simply cannot ascribe so little significance to the lab analyst as Dominguez would have us do.[4]

---

[4]     The notion of "machine testimony" is a subject about which there are widely divergent viewpoints in the legal community.  (Compare *People v. Lopez* (2012) 55 Cal.4th 569, 583 with *id.* at pp. 606–607 (dis. opn. of Liu, J.).)  We do not underestimate the challenges facing the legal system as it confronts developments in the field of artificial intelligence, but those are not issues presented by the facts of this case.

Dominguez also argues that ESR's provision of software updates, technical support, and initial training to the lab renders it a member of the prosecution team.[5] As a threshold matter, we observe that Dominguez fails to explain how these generalized activities show that ESR was "acting on the government's behalf *in the case*." (*Kyles v. Whitley*, *supra*, 514 U.S. at p. 437, italics added.) But perhaps more importantly, in making this argument we think Dominguez overstates the extent of interaction between ESR and the lab. Monpetit explained that although the lab paid for yearly upgrades, allowing them to download and use new versions of the software, "whether or not [to] actually implement different versions [was] up to [the lab]." As of the March 2018 hearing, the lab had updated the program three times since its purchase in 2015.

As for training support, the extent of ESR's interaction with the lab was limited to the provision of some introductory materials and a single weeklong training January 2015, attended by 9 of the lab's 15 analysts. Since then, the lab conducted all of its training on the program in-house. And with respect to the lab's initial validation of the program, Monpetit did state that ESR provided technical support via email during the process. But he also made clear that the lab's validation process was wholly independent of any validation efforts undertaken internally by ESR.

---

5 Dominguez additionally asserts that "[i]f a defense lawyer contests the admissibility of STRmix, ESR provides the prosecution with an expert witness who can purportedly establish the foundational validity of the program." Since the People did not controvert this fact in their reply to Dominguez's return, we take it as true. (See *Negro v. Superior Court* (2014) 230 Cal.App.4th 879, 894.) Yet still, we find the representation to be of scant relevance. We have located no indication that use of this procedure has ever been contemplated in this case, nor any indication that the lab has ever employed it in the past.

Monpetit's testimony regarding the extent of the lab's reliance on ESR's technical support was similar. While ESR offered such support, the lab's use was "pretty rare. . . . If there [was] an issue, analysts [would] come to [him]," as the technical manager, and only if Monpetit could not answer the question would he "probably seek support outside." "Generally," however, Monpetit could answer the questions himself—"every once in a while [he] need[ed] to contact ESR, but it [was] kind of rare."

In sum, it appears that any interaction between ESR and the lab was far from significant, especially with respect to Dominguez's particular case. And, as we have explained, the level of involvement an outside entity has in a case is important. On this issue, we find illustrative the recent opinion from Division Three of the First Appellate District in *IAR*, *supra*, 12 Cal.App.5th 503. The court in *IAR* concluded that a victim's legal counsel (the Valla firm) was not a member of the prosecution team, despite the fact that it had conferred on several instances with the district attorney, even sharing legal authorities. (*Id.* at pp. 507, 519.) More specifically, Valla had corresponded with the district attorney's office regarding (1) case citations for a possible ratification defense; (2) the crimes likely to be charged and their relationship to a deposition in the related civil case; and (3) "the government's need—and inability to pay—for a forensic accountant to analyze the complicated financial data that would establish defendant's guilt." (*Id.* at p. 512.) Nevertheless, the court of appeal found that the victim's counsel's "involvement with the prosecution as a cooperating witness in this matter ha[d] not been *significant enough* to warrant the trial court's finding that [its] files should be deemed

under the district attorney's 'control' for purposes of *Brady*." (*IAR*, at p. 519, italics added.)

Even less indicia of control—if any—are present here than in *IAR*. As we have already noted, ESR would likely not even know Dominguez's case existed were it not for his discovery requests. In other words, we are hard-pressed to say ESR's involvement is more significant than that found insufficient for imputation in *IAR*.

Dominguez's final argument on this point is that the subpoena process might be insufficient for him to obtain discovery from ESR. He cites the fact that both ESR and NicheVision have objected to his subpoena duces tecum, ostensibly on grounds of jurisdictional immunity. He reasons that if ESR's putative claim of jurisdictional immunity holds water, "then it is only the prosecution, through negotiation of its contractual obligations with ESR, that can procure" information from it.

To be certain, our cases make clear that the statutory phrase " 'in the possession' " of the prosecution encompasses information " 'reasonably accessible' to it." (*Littefield*, *supra*, 5 Cal.4th at p. 135; accord, *People v. Little*, *supra*, 59 Cal.App.4th at p. 431.) Yet we think Dominguez here unjustifiably imports, as definitive, a comparative metric into the notion of "reasonable accessibility." That is, he seems to posit that because it might be easier for the prosecution than the defense to get the materials, they are reasonably accessible to the prosecution. Relative difficulty, however, is not the relevant analysis. To the contrary, Supreme Court authority explains that "the prosecution has no *general duty* to seek out, obtain, and disclose all evidence that might be beneficial to the defense. [Citations.]" (*Littefield*, at p. 135.)

21

In a related vein, what Dominguez deems "reasonably accessible"—renegotiation of an entire contract—is not necessarily so. Rather, this case seems more on all fours with our discussion of subpoena practice in *Barrett*, *supra*, 80 Cal.App.4th 1305. Having determined that certain documents in the CDC had to be sought by way of a subpoena, we considered whether the onus of issuing the subpoena fell on the prosecution or defendant. (*Id.* at p. 1318.) Like here, "for all practical purposes" the parties "may have [had] nearly equal access to the CDC materials." (*Id.* at p. 1319.)[6] We opined that it "ma[de] more sense for the task [of subpoenaing the CDC] to fall on [the defendant]," given that his counsel, "who obviously would know the defense theory, presumably would [have been] able to make a stronger advocacy pitch for production of the materials by CDC," should it resist production. (*Ibid.*) The same can be said here.

Moreover, we observe that there is something perhaps incongruous between Dominguez's position here (i.e., that ESR is a member of the prosecution team) and his speculation that the prosecution will need to renegotiate its contract terms with ESR in order to obtain certain information. As we have explained, whether to impute certain information to the prosecution is, at base, a question of agency law that requires consideration of the degree of control the prosecution exercises over the relevant entity. (*IAR*, *supra*, 12 Cal.App.5th at p. 518.) The fact that the prosecution would have to renegotiate its entire contract with ESR in order to get the materials Dominguez requests

---

6    For that matter, we cannot help but point out here that Dominguez's counsel has been offered access to the materials under an NDA, and that NDA appears to contemplate his ability to disclose them if legally compelled.

22

is inconsistent with the notion that the prosecution currently has control over whether the materials are provided. (See *ibid.* ["A principal has the right to control the conduct of the agent with respect to matters entrusted to him" (internal quotation marks omitted)].)

Although not explicitly relied upon by Dominguez here, we consider briefly one of the slightly different bases upon which the trial court rested its decision that ESR was a member of the prosecution team. The trial court appeared to heavily weigh the purpose of the STRmix program insofar as it was marketed to law enforcement agencies, among others. The court reasoned, "[I]f ESR is in for a penny, [it] is in for a pound." We certainly empathize with the court's point, especially given the ever-growing level of technical automation in our criminal justice system. (See, e.g., Imwinkelried, *Computer Source Code: A Source of the Growing Controversy Over the Reliability of Automated Forensic Techniques* (2016) 66 DePaul L.Rev. 97.) Likewise, we acknowledge that similar concerns regarding the purpose of an agency's establishment were weighed in *Uribe*, *supra*, 162 Cal.App.4th at pages 1477 to 1478. Yet as a counterweight to this rationale, we note that STRmix is used by *both* prosecution and defense teams; it is not marketed as solely a prosecutorial device. And we hesitate to assign an entity membership in a prosecutorial team simply based on one possible use of its product.

All told, we find on this record that ESR is not a member of the prosecution team. We accordingly grant writ relief insofar as the discovery order required that Dominguez be provided with items—ESR's internal validation studies and the STRmix source code—that are within the exclusive possession and control of ESR.

3.      *Production of the Software*

With respect to the software program itself, the People urge it falls outside the scope of our criminal discovery provisions because it is solely "equipment" and thus not "exculpatory evidence" within the meaning of section 1054.1, subdivision (e).  While Dominguez's briefing addresses multiple categories of evidence, he does not squarely address what about the software would be exculpatory.

On this point, we think the People have the better argument.  Nothing in the record before us indicates that the software suffered a problem that might have affected the results *in this case*.  Although we recognize that our discovery statutes embrace a broader range of exculpatory evidence than does *Brady* (see *Barnett*, *supra*, 50 Cal.4th at p. 901), we find Dominguez's speculation regarding the "black box" nature of STRmix is not enough to warrant ordering the prosecution to turn over its software.  (Cf. *People v. Robinson* (N.Y.Sup.Ct. 2008) 860 N.Y.S.2d 159, 166 ["Since the defendant offered no factual basis to support his contention that the source code in the [breathalyzer] used to test him might have contained software glitches which made its [blood alcohol content] measurements inaccurate, his request to compel disclosure of the source code on that basis constitutes nothing more than a fishing expedition"].)

24

4. *Production of the User Manuals*

The user manuals Dominguez seeks present a slightly different question than the materials we have discussed thus far.[7] The People contend that disclosing the manual to the defense would run afoul of United States copyright law (17 U.S.C. § 106), the nondisclosure agreement the lab executed with ESR, and ESR's claimed trade secret privilege. The People do not fully flesh out these consequences as a basis for relief in this writ proceeding. Rather, they urge that relief is warranted because the proper procedure for ordering disclosure, as mandated by Evidence Code section 1060, was not followed. Alternatively they argue that Dominguez failed to make a showing sufficient to overcome any purported privileges or protections. In its amicus brief, ESR echoes these concerns, emphasizing that it was "at a minimum . . . entitled to be heard on the issue."

Evidence Code section 1060 provides that "[i]f he or his agent or employee claims the [trade secret] privilege, the owner of a trade secret has a privilege to refuse to disclose the secret, and to prevent another from disclosing it, if the allowance of the privilege will

---

[7]     In their briefing, the People explicitly "recognize[d] that the manuals are potentially exculpatory evidence in the possession of [the lab]." They took a different position at oral argument, positing that the user manuals are outside the classes of evidence required to be disclosed by section 1054.1. Specifically, the People asserted that the manuals did not constitute "exculpatory evidence" within the meaning of section 1054.1, subdivision (e). Bearing in mind that our discussion in section 3 of this opinion may be pertinent to that issue, we nevertheless decline to decide it. Instead, our decision regarding the user manuals turns on the fact that ESR was not heard before the discovery was ordered. We expect that, on remand, the trial court will remain mindful that the user manuals must fall within a category delineated by section 1054.1, as it considers whether to order their disclosure by the People.

not tend to conceal fraud or otherwise work injustice."  Section 1061 of that code

provides the procedure for asserting a trade secret.

In the civil context, *Bridgestone/Firestone, Inc. v. Superior Court* (1992) 7

Cal.App.4th 1384 (*Bridgestone*) elaborated on the appropriate process when trade secret

protection is claimed:

> "[T]he party claiming the privilege has the burden of establishing its
> existence.  [Citations.]  Thereafter, the party seeking discovery must
> make a prima facie, particularized showing that the information
> sought is relevant and necessary to the proof of, or defense against, a
> material element of one or more causes of action presented in the
> case, and that it is reasonable to conclude that the information sought
> is essential to a fair resolution of the lawsuit.  It is then up to the
> holder of the privilege to demonstrate any claimed disadvantages of
> a protective order.  Either party may propose or oppose less intrusive
> alternatives to disclosure of the trade secret, but the burden is upon
> the trade secret claimant to demonstrate that an alternative to
> disclosure will not be unduly burdensome to the opposing side and
> that it will maintain the same fair balance in the litigation that would
> have been achieved by disclosure."

(*Id.* at p. 1393.)  The People and ESR urge us to follow that procedure in this criminal

action.  They further posit that the trial court could not appropriately "balanc[e] the

interests of both sides, [to] conclude[ ] that under the particular circumstances of the case,

no fraud or injustice would result from denying disclosure" (*Bridgestone*, at p. 1393)

without having ESR present.

Dominguez does not respond directly to arguments regarding ESR's right to be

heard.  Rather, he argues that "[i]t is hard to think of a greater injustice than preventing a

criminal defendant from fully exploring all his viable defenses and challenges to the

evidence in a criminal case."  He also cites the fact that "it is clear that [he] and [his

26

defense] counsel are not ESR's business competitors." ESR, for its part, refutes this argument as "overlook[ing] the fact that it is the release of the [protected] information . . . , not the status of the recipient" that is of concern. Similarly, ESR posits that "the suggestion that the disclosure of [its trade secrets] is permissible because ESR has a remedy to obtain damages if the information is utilized by a competitor defeats the purpose of the underlying principle of trade secrets."

While the People argue that Dominguez failed to overcome the trade secret privilege, the parties' briefs to a certain extent talk past each other regarding what ESR's role, if any, should be in this process. As we understand Dominguez's argument, he contends that as a matter of law his interests overcome any possible trade secret privilege that could be claimed.

But we do not see this issue as one amenable to decision as a matter of law, completely lacking any input from the party claiming a right (i.e., here, ESR). While Dominguez's interests may ultimately trump those of ESR's, we conclude that the court could not fully consider these issues without having ESR present. Indeed, at the hearing, the prosecutor noted ESR's absence ad nauseam. We think he was right to do so. Simply put, although the trial court assumed that ESR was invoking its privileges, nothing before it illuminated the full extent of the interests ESR could assert. ESR must be afforded the opportunity to be heard *before* the trial court balances the interests and makes a decision.

27

DISPOSITION

Let a writ of mandate issue directing the superior court to (1) vacate its order of March 29, 2018, (2) enter a new order denying defendant's motion to compel production of the STRmix software program, the program source code, and ESR's internal validation studies, and (3) conduct further proceedings consistent with this opinion with respect to the STRmix user manual.  The stay issued on May 18, 2018 will be vacated when this opinion is final as to this court.


                                                                                                    DATO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


HALLER, J.